UNITED STATES BANKRUPTCY COURT
NORTHERN DISTRICT OF NEW YORK
_____

In re:

MARK R. SHELMIDINE and                              Chapter 7
TAMMY L. SHELMIDINE,                                Case No.: 13-60354

                        *Debtors*.
_____

In re:

UNITED STATES OF AMERICA,                           Adv. Pro. No.: 13-80008

                        *Plaintiff*,

v.

MARK R. SHELMIDINE,

                        *Defendant*.
_____
APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE       WILLIAM F. LARKIN, ESQ.
*Attorney for Plaintiff*
100 South Clinton Street
Syracuse, New York 13261-7198

BODOW LAW FIRM, PLLC                 THEODORE LYONS ARAUJO, ESQ.
*Attorney for Debtor-Defendant*
313 East Willow Street, Suite 105
Syracuse, New York 13203-1905

Honorable Diane Davis, United States Bankruptcy Judge

## MEMORANDUM-DECISION AND ORDER

      Mark R. Shelmidine and Tammy L. Shelmidine (collectively, "Debtors") filed a joint Voluntary Petition for chapter 7 relief under Title 11[1] of the United States Code on March 9, 2013. (ECF No. 1.) The United States of America, acting through the Farm Service Agency,

---

[1] 11 U.S.C. §§ 101-1532 (2012) (the "Bankruptcy Code"). Unless otherwise indicated, all further section references are to the Bankruptcy Code.

United States Department of Agriculture ("FSA") (hereinafter, "Plaintiff") commenced this adversary proceeding on July 24, 2013, by filing an adversary Complaint seeking to except from the discharge issued to Mark R. Shelmidine ("Defendant")[2] a debt owed FSA in the amount of $64,325.35 pursuant to § 523(a)(6).  (ECF Adv. No. 1.)  Defendant filed an Answer to the Complaint on September 27, 2013, therein denying the material allegations, raising certain affirmative defenses,[3] and requesting dismissal of the Complaint and reimbursement of reasonable attorney's fees and costs.[4]  (ECF Adv. No. 5.)  Plaintiff and Defendant thereafter filed Pre-Hearing Memoranda on May 12, 2014.  (ECF Adv. Nos. 13 and 14, respectively.)[5]  The matter came to trial on May 20, 2014.  After the close of Plaintiff's case, Defendant moved for a "directed verdict."[6]  The Court reserved on the motion and took the matter under advisement. Plaintiff thereafter submitted a Post-Trial Memorandum on August 18, 2014.  (ECF Adv. No. 24.)  By letter dated August 18, 2014, Defendant advised the Court that no supplementation to the record was necessary. (ECF Adv. No. 25.)  For the reasons set forth below, the Court having considered all the pleadings and the evidence adduced at trial, the Court finds in favor of

---

[2] Mark R. Shelmidine and Tammy R. Shelmidine are joint debtors in the bankruptcy.  Mark R. Shelmidine is the only named defendant in the adversary proceeding.

[3] While Defendant raised certain defenses in his Answer, none were pursued and Defendant offered no proof at trial. Accordingly, the defenses are deemed abandoned.  *Gulfcoast Workstation Corp. v. Peltz (In re Bridge Info. Sys.)*, 460 F.3d 1041, 1046-47 (8th Cir. 2006) (affirming bankruptcy court's judgment on the ground that transferee abandoned new value defense by failing to offer evidence of the defense at trial).

[4] Defendant has not provided a basis for this request.  "'Deviation from the American Rule that each side bears the expense of its attorneys' fees and costs requires either a statutory or contractual basis.'"  *McMurray v. Lagano (In re Lagano)*, 2014 Bankr. LEXIS 3002, at *23 (Bankr. N.D.N.Y. July 11, 2014) (quoting *Bd. of Tr., Adirondack Carpenters Pension Fund v. Parker (In re Parker)*, 388 B.R. 11, 22 (Bankr. N.D.N.Y. 2008)).  Accordingly, Defendant's request must be denied.

[5] The Court notes that Pre-Hearing Memoranda were not required by the pre-trial Scheduling Order.  For the reasoning set forth above, *supra* note 3, the Court will likewise disregard those arguments raised in the parties' Pre-Hearing Memoranda but not otherwise pursued at trial.

[6] In a bench trial, the appropriate procedural vehicle for dismissing a case as a matter of law due to Plaintiff's insufficient evidentiary showing is a motion under Civil Rule 52(c) ("Rule 52(c)") for judgment on partial findings. The Court therefore construes Defendant's motion as a Rule 52(c) motion, made applicable to adversary proceedings by Bankruptcy Rule 7052.  Rule 52(c) authorizes the Court to enter judgment at any time the Court can make a dispositive finding appropriately on the evidence.  In determining whether Defendant is entitled to judgment, the Court must assess Plaintiff's evidence and determine whether it is sufficient to support a finding that the debt owed is nondischargeable under § 523(a)(6); if it is not, Defendant is entitled to judgment under Rule 52(c).

Plaintiff.  As is required by Bankruptcy Rule 7052, this Memorandum-Decision and Order sets forth the Court's findings of fact and conclusions of law.

## JURISDICTION

The Court has jurisdiction over the parties and subject matter of this adversary proceeding pursuant to 28 U.S.C. §§ 1334, 157(a), and 157(b)(1).  This matter constitutes a core proceeding under 28 U.S.C. § 157(b)(2)(I).

## FACTS

The parties filed a Joint Stipulation of Facts ("JSF") and Joint Exhibit List ("Exhibit") from which the Court makes the following findings.  (ECF Adv. Nos. 15 and 16, respectively.) During all relevant periods, Debtors operated a small dairy farm in New York State.[7]  In an attempt to keep the farm operational despite a devastating decline in milk prices in the United States, Debtors sought financial assistance from FSA.  (Exhibit 12.)  This adversary proceeding arises from the facts and circumstances surrounding three (3) loans Debtors obtained from FSA pursuant to the provisions of the Consolidated Farm and Rural Development Act (7 U.S.C. § 1921) in the years 2008 and 2009.[8]  (JSF 1.)

1. On May 1, 2008, Debtors obtained the first loan from FSA in the amount of $12,500.00. This loan was rescheduled on August 26, 2009, in the amount of $3,714.79.  This loan, as rescheduled, is evidenced by two Promissory Notes.
2. On May 1, 2008, Debtors obtained a second loan from FSA in the amount of $147,000.00.  This loan was also rescheduled on August 26, 2009, in the amount of $144,498.43.  This loan, as rescheduled, is evidenced by two Promissory Notes.

---

[7] Debtors first operated the dairy farm in Oswego County, New York and later moved operations to Lewis County, New York.

[8] Mark R. Shelmidine filed a Voluntary Petition for chapter 7 relief under Title 11 of the United States Code on November 4, 2004, and received a discharge on February 14, 2005, under Case Number 04-77796-SDG.  The Court notes that due to Defendant's prior bankruptcy and Debtors' 100% debt-to-equity ratio, it appears Debtors were unable to obtain credit from other lenders.  (Exhibit 12.)

    3. On August 26, 2009, Debtors obtained a third loan from FSA in the amount of $11,900.00. This loan is evidenced by a Promissory Note.

(JSF 1.) To secure repayment of these loans, Debtors executed and delivered to FSA two Mortgages covering real property located in Oswego County, New York, both properly recorded in the Oswego County Clerk's Office. (JSF 2.)

To further secure repayment, Debtors executed and delivered to FSA two Security Agreements dated May 1, 2008 and August 26, 2009. (JSF 2.) The Security Agreements granted FSA a security interest in, *inter alia,* Debtors' farm equipment, machinery, crops, and cattle. (JSF 2; Exhibit 8.)[9] FSA perfected and maintained its security interest in Debtors' chattel by filing a financing statement with the New York Department of State on April 9, 2008. A Continuation Statement was later filed on March 11, 2013. (JSF 2-3.)

The Promissory Notes, Security Agreements, and the Agreement for the Use of Proceeds between Defendant and FSA clearly define the parameters regarding sale of FSA's collateral. Paragraph 16 of each Promissory Note signed and initialed by Defendant states that "[p]roperty constructed, improved, purchased or refinanced in whole or in part with the loan evidenced by this note shall not be leased, assigned, transferred, or encumbered, voluntarily or otherwise, without the written consent of the Government." (Exhibits 1-5.) In addition, both Security Agreements, also signed by Defendant, contain several standard paragraphs denoting same. (JSF 2.) Paragraph 3(e) states "Debtor will immediately notify Secured Party of any material change in the collateral or in the collateral's location; change in Debtor's name, address or location; change in any warranty or representation in this Security Agreement; change that may affect this

---

[9] On or about August 6, 2009, Defendant was approved by FSA for an Operating Loan in the amount of $11,900.00. (Exhibit 13.) Said loan was provided to satisfy four of Defendant's accounts payable necessary to continue dairy farm operations, reschedule two of Defendant's prior loans, and provide for a five-year payment deferral on each of the outstanding loans. The Operating Loan was also secured by Defendant's farm equipment, machinery, crops and cattle. (JSF 3; Exhibit 13.) The Note further identifies FSA's previous blanket lien on Defendant's collateral; the blanket lien at issue. (Exhibit 13.)

security interest or its perfection; and any event of default." (JSF 2-3.) Paragraph 4(l) states, in bolded capital letters, "SECURED PARTY HAS INFORMED DEBTOR THAT DISPOSAL OF PROPERTY COVERED BY THIS SECURITY AGREEMENT WITHOUT THE CONSENT OF SECURED PARTY, OR MAKING ANY FALSE STATEMENT IN THIS SECURITY AGREEMENT OR ANY OTHER LOAN DOCUMENT, MAY CONSTITUTE A VIOLATION OF FEDERAL CRIMINAL LAW." (JSF 3; Exhibits 8, 9.) Further, Paragraph A of the Agreement for the Use of Proceeds, titled "Do I Have Written Consent to Sell?," states "I understand that I must obtain written consent before I can sell, exchange, feed to livestock, consume, or in any way dispose of collateral." (JSF 4; Exhibit 13.) Finally, Paragraph E states, "[y]ou agree to allow me to sell or exchange crops, livestock, and livestock products planned to be marketed in the regular course of business so that I can pay essential family living and farm operating expenses. Essential expenses are those which are basic, crucial, or indispensable. . . ." (JSF 4.)

Unlike the typical debtor-creditor relationship, the record reflects that Debtors and FSA maintained an active relationship during the term of the loans, aptly named by FSA "supervised credit," in which FSA provided direction and advice to farmers like Debtors. (Trial Tr. 30, May 20, 2014 Trial, ECF Adv. No. 20.) The supervised credit relationship involved an annual field visit and chattel appraisal every six months. (Trial Tr. 28.)

In October 2011, Debtors incurred financial difficulty in the continued operation of the dairy farm and sought additional assistance from FSA. On or about October 14, 2011, Debtors and FSA entered into an Agreement for the Use of Proceeds/Release of Chattel Security for the 2011 crop year, which permitted Debtors to retain the proceeds from the sale of up to six cull cows,

valued at $4,032.00 and the sale of up to thirty-five calves, valued at $3,264.00. (JSF 3-4; Exhibit 13.) Thus, Debtors were permitted to retain a total of $7,296.00 in sale proceeds.

On or about November 5, 2011, Defendant signed a Promissory Note in the amount of $40,000.00, payable to Robert Scoville, for the purchase of forty cattle. (JSF 5; Exhibit 15.) This debt was secured by a perfected Security Agreement, in which Mr. Scoville retained a lien on the cattle. (Trial Tr. 44; Exhibit 15.) The record reflects, and Defendant concedes, that Defendant did not discuss the proposed purchase from Mr. Scoville with FSA. (JSF 5.)

By the end of 2011, Defendant had sold sixteen cattle on various occasions under the name John Williams at the NNY Farmer's Marketing Co-op, Inc., resulting in sale proceeds in the amount $12,863.99, which Defendant applied to the purchase of cattle feed from John Williams. (JSF 6; Exhibit 21.) In that same year, Defendant sold fifty-three cattle, under Defendant's own name, which resulted in sale proceeds of $38,467.20. (JSF 6; Exhibit 22.) The following year, in 2012, Defendant sold forty-four cattle, which resulted in sale proceeds of $33,274.47. (JSF 6; Exhibit 22.)

FSA became aware of the transaction between Defendant and Mr. Scoville and of Defendant's sale of cattle after Defendant applied for yet another loan from FSA on May 1, 2012.[10] As part of the loan application process, Defendant completed a Farm Business Worksheet, dated May 1, 2012, indicating that he had sold sixty-five cows, valued at $48,882.00, and sixteen calves, valued at $983.00, for a total sum of $49,865.00. (*See* JSF 5-6.) FSA thereafter conducted a chattel appraisal on May 16, 2012, which revealed that Defendant's herd decreased to seventy-seven cattle, of which thirty-seven belonged to FSA. (JSF 5; Exhibit 16.) During FSA's chattel appraisal, Defendant disclosed that the other forty cattle in Defendant's

---

[10] The record reflects that Defendant sought a loan for the purpose of purchasing a farm, modular home, and additional cattle. (Trial Tr. 41.)

herd belonged to Mr. Scoville. (Trial Tr. 43.) As a result of the marked decline in collateral and in the absence of an accounting for the corresponding sale proceeds, FSA provided Defendant with a Notification of Unauthorized Use of Proceeds by letters dated August 6, 2012, September 5, 2012, and December 10, 2012, each sent by certified and regular mail. (JSF 6; Exhibits 17-19.) Each Notification advised Defendant that the unauthorized sale of FSA's collateral constituted a violation of the executed Security Agreements, and contained a demand for compensation or replacement of collateral. (*See* Exhibits 17-19.) Thereafter, Defendant's final request for a loan was denied. (Trial Tr. 45.)

As of December 3, 2012, only forty cattle and four calves remained, all of which were subject to Mr. Scoville's security interest. (JSF 6; Trial Tr. 55-56.) Over a two-year period, Defendant sold one hundred and thirteen cattle, resulting in total sale proceeds of $84,605.66. The parties do not dispute the fact that none of the proceeds from these sales were remitted to FSA (JSF 6), despite FSA's first lienholder position and an outstanding loan valued at $160,530.52 as of June 4, 2013 (ECF Adv. No. 1). The parties do, however, dispute whether Defendant was required to remit said proceeds.

**ARGUMENTS**

Plaintiff alleges that Defendant's use of cash proceeds from allegedly unauthorized sales of collateral in which Plaintiff held a security interest constitutes a conversion that was willful and malicious under 11 U.S.C. § 523(a)(6).

Defendant, on the other hand, focuses on the nature of the supervised credit relationship between Defendant and FSA and contends that the sales were impliedly authorized and/or consented to by FSA, which, Defendant alleges, demonstrates that the sales were neither willful

nor malicious under 11 U.S.C. § 523(a)(6). Defendant alternatively asserts a business necessity defense.

## DISCUSSION

Section 523(a) establishes the exclusive grounds for which a debt may be excepted from the discharge granted under § 727. Plaintiff has the burden of proving each element essential to its claim of nondischargeability and must prove its case by a preponderance of the evidence. FED. R. BANKR. P. 4005; *Grogan v. Garner,* 498 U.S. 279, 291 (1991). Further, "[o]bjections to the dischargeability of a debt are to be literally and strictly construed against the objector and liberally construed in favor of the debtor." *See e.g., Sec. Alarm Fin. Enters., LP v. Terrell (In re Terrell),* 2007 Bankr. LEXIS 4330 (Bankr. C.D. Cal. Dec. 14, 2007).

Section 523(a)(6), in particular, excepts from discharge debts incurred for "willful and malicious injury by the debtor to another entity." 11 U.S.C. § 523(a)(6). "Such an injury can include an injury to a property interest held by another." *In re Redick*, 2007 Bankr. LEXIS 2978, at *8 (Bankr. N.D. Ga. July 13, 2007) (collecting cases). Accordingly, courts have routinely held that a debtor's conversion of a secured creditor's collateral may rise to the level of a willful and malicious injury. *In re Foust*, 52 F.3d 766 (8th Cir. 1995); *Martin v. Key Bank, N.A. (In re Martin),* 208 B.R. 799, 803 (N.D.N.Y. 1997); *United Orient Bank v. Green*, 215 B.R. 916, 928 (S.D.N.Y. 1997); *Americredit Fin. Servs. v. Smithey (In re Smithey)*, 2005 Bankr. LEXIS 484, at *8 (Bankr. N.D. Ga. Feb. 16, 2005); *Moog Emps. Fed. Credit Union v. Kibler* (*In re Kibler)*, 172 B.R. 740, 743 (Bankr. W.D.N.Y. 1994). However, it is well settled that "[a] willful and malicious injury does not follow as a course from every act of conversion without reference to the circumstances." *Davis v. Aetna Acceptance Co.,* 293 U.S. 328 (1934). As one Court has noted, "the key in conversion cases is to analyze each set of circumstances on a case-by-case

basis to determine whether the conversion is in the nature of an intentional tort. . . ." *Avco Fin. Servs. v. Kidd (In re Kidd)*, 219 B.R. 278, 284 (Bankr. D. Mont. 1998).  Because § 523(a)(6) is a two-element standard, the Court must analyze each element as a threshold issue. *See Markowitz v. Campbell (In re Markowitz),* 190 F.3d 455, 463 (6th Cir. 1999) (noting that the absence of either the willful or malicious requirement from § 523(a)(6) creates a dischargeable debt).

To establish that a debt is one that arises from a willful injury, a plaintiff must make a showing of debtor's subjective intent to cause injury or debtor's objective knowledge that his acts were substantially certain to cause injury. *Miller v. J.D. Abrams, Inc. (In re Miller),* 156 F.3d 598, 603 (5th Cir. 1998); *Conte v. Gautum (In re Conte),* 33 F.3d 303, 307 (3d Cir. 1994); *Makozy v. Makozy (In re Makozy)*, 2014 Bankr. LEXIS 3831, at *6 (Bankr. W.D. Pa. Sept. 9, 2014); *Chaffee v. Chaffee (In re Chaffee),* 2013 Bankr. LEXIS 3641, at *18 (Bankr. N.D.N.Y. Sept. 3, 2013) (citing cases); *Americredit Fin. Servs. v. Smithey (In re Smithey),* 2005 Bankr. LEXIS 484, at *12 (Bankr. N.D. Ga. Feb. 16, 2005).  In the absence of debtor's testimony establishing same, "the court may infer subjective intent or substantial certainty from the facts and circumstances surrounding the defendant's conduct." *In re Terrell,* 2007 Bankr. LEXIS 4330, at *15; *Spokane Ry. Credit Union v. Endicott (In re Endicott),* 254 B.R. 471, 477 n.9 (Bankr. D. Idaho 2000) ("The use of the term 'objective' is not talismanic nor at odds with *Geiger* if it is viewed as simply recognizing that a debtor will have to deal with any direct or circumstantial evidence which would indicate that he must have had a substantially certain belief that his act would injure, notwithstanding any subjective denial of such knowledge.").  With specific regard to cases involving conversion of collateral, courts have inferred willful injury upon "proof that the debtor intended to improperly dispose of the creditor's collateral and used the proceeds for purposes other than payment of the secured debt." *Farmers State Bank of W.*

*Illinois v. Simpson (In re Simpson),* 2010 Bankr. LEXIS 951, at *4 (Bankr. W.D. Ill. Apr. 14, 2010) (citing *In re Russell*, 262 B.R. 449, 455 (Bankr. N.D. Ind. 2001)).

Plaintiff has established that Defendant sold or disposed of the cattle without Plaintiff's knowledge or permission. Further, both parties concede that none of the proceeds from the sales of the cattle were applied to the repayment of Defendant's debt. Yet, the numerous contracts between the parties cited *infra,* in conjunction with the ongoing supervised credit relationship, suggest that Defendant knew of Plaintiff's security interest in the cattle and was aware of his obligation to obtain FSA's permission prior to the sales. The contention that Defendant's conduct caused a willful injury to FSA in this case is supported by the fact that Defendant used the proceeds for purposes other than payment of FSA's secured debt, namely, to pay another secured creditor. Under the circumstances, the Court may infer that Defendant either possessed the requisite intent to injure FSA or was substantially certain such injury would occur from his disposition of the proceeds belonging to FSA, to a third party, from whom FSA could not recover. Based on the parties' submissions and emphasis on the element of malice, it seems Defendant tacitly agrees that his conduct satisfies the willfulness prong of Plaintiff's § 523(a)(6) cause of action.[11]

Plaintiff must also provide sufficient proof of malice in order to succeed on the nondischargeability claim. The term 'malicious' within the context of § 523(a)(6) has been defined by the Second Circuit Court of Appeals to mean "wrongful and without just cause or excuse, even in the absence of personal hatred, spite, or ill-will." *Navistar Fin. Corp. v. Stelluti (In re Stelluti),* 94 F.3d 84, 87 (2d Cir. 1996) (citations omitted). This definition does not require a plaintiff to prove specific malice, ill will or spite on the part of the debtor. *See, e.g., In re*

---

[11] The parties' summary of contested legal issues states that the "primary legal issue" is "whether Mr. Shelmidine's actions . . . constituted malicious injury," suggesting that Defendant has conceded that the acts in question were willful, as defined by 11 U.S.C. § 523(a)(6). (ECF Adv. No.11.)

*Hanes*, 214 B.R. 786, 822 (Bankr. E.D. Va. 1997). "Instead, implied malice may be shown by the acts or conduct of the debtor in the context of his surrounding circumstances." *Id.* (citing *St. Paul Fire & Marine Ins. Co. v. Vaughn,* 799 F.2d 1003, 1009-10 (4th Cir. 1985)). Specifically, "'[t]o establish implied or constructive malice, it is sufficient to show that [a debtor] deliberately and intentionally committed an act which he knew would necessarily injure a cognizable right of the creditor.'" *In re Hunter*, 229 B.R. 851, 860 (Bankr. M.D. Fla. 1999) (quoting *Cladakis v. Triggiano (In re Triggiano)*, 132 B.R. 486, 490 (Bankr. M.D. Fla. 1991)). As the wealth of case law indicates, this inquiry must be guided by the totality of the circumstances, and, as such, "requires an examination of the relationships among the parties, the economic circumstances, and the reasonably held beliefs of the parties." *Ford Motor Credit Co. v. Franceschini (In re Franceschini)*, 2011 Bankr. LEXIS 1527, at *16 (Bankr. S.D. Tex, April 19, 2011.) However, where a plaintiff provides evidence such that malice may be inferred from the totality of the circumstances, *In re Stelluti,* 167 B.R. 29, 33 (Bankr. S.D.N.Y. 1994) (quotation omitted), *aff'd*, 94 F.3d 84 (2d Cir. 1996), such inference can be rebutted. *In re Franceschini,* 2011 Bankr. LEXIS 1527, at *15.

In the instant matter, Defendant's actions were certainly deliberate and intentional. In light of the specific language of the loan documents as stated *infra*, the Court must also infer that Defendant's injurious acts were done "in knowing disregard" of FSA's rights. *Printy v. Dean Witter Reynolds, Inc.*, 110 F.3d 853, 859 (1st Cir. 1997) ("[I]f the act of conversion is done deliberately and intentionally in knowing disregard of the rights of another, it falls within the statutory exclusion [from discharge in bankruptcy]." (citing *St. Paul Fire & Marine Ins. Co.*, 779 F.2d at 1008)); *First Nat'l Bank v. Stanley (In re Stanley),* 66 F.3d 664, 667 (4th Cir. 1995) (same). Although Defendant did not use the proceeds in order to reap a personal

financial gain, he did use the proceeds to favor certain creditors and elevated such creditors' rights above those of FSA.  This conduct necessarily leads the Court to infer malice.  In the absence of any testimony from Defendant, the Court cannot find that Defendant acted in furtherance of keeping his farming operation afloat or that he reasonably believed based on the parties' past dealings that he was authorized to dispose of FSA's collateral.  Thus, the Court cannot find "just cause or excuse" to rebut such inference.  Accordingly, the Court is constrained to find that Defendant's violation of the Security Agreements was done with malice.

## CONCLUSION

For the foregoing reasons, the Court concludes that Defendant's conduct was willful and malicious within the meaning of Section 523(a)(6).  Accordingly, it is hereby

ORDERED, that Defendant's Rule 52(c) motion is denied; and it is further

ORDERED, that Defendant's request for attorneys' fees is denied; and it is further

ORDERED, that Plaintiff's claim under § 523(a)(6) seeking exception of the debt owed to it from Defendant's discharge is sustained.

IT IS SO ORDERED.

Dated at Utica, New York
This 30th day of September 2014

/s/Diane Davis
DIANE DAVIS
United States Bankruptcy Judge